Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel VIII

| | | |
|---|---|---|
| SAMUEL PETER HUGLI SUTTER; NANCY IVETTE HERNÁNDEZ GUASCH; Y LA SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR AMBOS<br>Apelantes<br><br>v.<br><br>PALMAS HOSPITALITY MANAGEMENT, LLC.; LIONSGROVE MANAGEMENT, LLC.; RÍO MAR HOSPITALITY MANAGEMENT, LLC.<br>Apelados | KLAN202500486 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso Núm. SJ2022CV10625<br><br>Sobre: Incumplimiento de Contrato; Discrimen por edad; Procedimiento Sumario |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Adames Soto y la Jueza Santiago Calderón

Adames Soto, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 29 de agosto de 2025.

Comparecen Samuel Peter Hugli Sutter, (señor Hugli Sutter), Nancy Ivette Hernández Guasch, y la Sociedad Legal de Bienes Gananciales compuesta por ambos (en conjunto, parte apelante), solicitando que revoquemos la *Sentencia* emitida el 16 de mayo de 2025 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante dicha determinación, el TPI acogió una *Solicitud de Sentencia Sumaria* presentada por Palmas Hospitality Management, LLC., Lionsgrove Management, LLC., y Río Mar Hospitality Management, LLC. (PHM, LM, RMH o, en conjunto, parte apelada), desestimando la causa de acción instada por los apelantes contra esta última.

Por los fundamentos que expondremos a continuación, *confirmamos.*

NÚMERO IDENTIFICADOR

SEN2025_____

## I. Resumen del tracto procesal[1]

El 5 de diciembre de 2022, el Sr. Hugli Sutter presentó una *Querella* en contra de los apelados, imputándoles incumplimiento de contrato y discrimen por razón de edad, acogiéndose al procedimiento sumario provisto por la Ley Núm. 2 de 17 de octubre de 1961, (Ley Núm. 2). Alegó que, para el 24 de marzo de 2021, suscribió un contrato[2] con PHM como empleado exento, para prestar servicios como "Managing Director" de *Wyndham Palmas del Mar Beach and Golf Resort,* y ejercer sus funciones a partir del 29 de marzo de 2021. Su compensación sería de $120,000.00 al año, más un bono de productividad de hasta un 50% del salario, incluyendo otros beneficios. Añadió que el término del contrato sería por un (1) año, a renovarse automáticamente por un (1) año adicional, a menos que se notificara la intención de dejarlo sin efecto con, por lo menos, quince (15) días de anticipación a su vencimiento. Adujo que, posteriormente, ocupó la posición de Vicepresidente de Operaciones de LM, mientras ejercía funciones y obligaciones como Gerente General de *Wyndham Palmas del Mar Beach and Golf Resort,* bajo los términos y condiciones del contrato suscrito con PHM.

El Sr. Hugli Sutter alegó en su *Querella* que a lo largo del tiempo en el que prestó sus servicios para PHM y RMH, hubo una serie de renuncias y nuevas contrataciones de personas que eran más jóvenes que él y realizaban funciones que confligían con las suyas, y a las cuales les ofrecían una paga mayor.[3] Igualmente, adujo que hubo promesas de aumento de salario y pago de bono por parte de PHM y LM, cuando se adquiriese mediante compraventa a RMH, que supuestamente no se cumplieron. Sostuvo que, posteriormente, el 14 de junio de 2022, PHM y RMH lo despidieron y cancelaron el contrato suscrito entre ellos, sin la

---

[1] Valga apuntar que, revisado el apéndice digital del presente recurso, notamos que las páginas de los documentos allí incluidos no fueron de están identificadas. Por tanto, toda referencia prospectiva a dicho apéndice, indicará las páginas correspondientes al archivo digital ("Portable Document Format" o PDF por sus siglas en inglés).

[2] Apéndice del recurso de *apelación*, págs. 86-95.

[3] *Íd.*, págs. 7-9.

notificación adecuada, cuyo fundamento para la cancelación fue una presunta reestructuración. Asimismo, arguyó que el despido fue uno discriminatorio por razón de su edad. A tenor, solicitó ser indemnizado.

A raíz de ello, los apelados presentaron sus respectivas contestaciones a querella. Luego de negar y admitir algunas de las alegaciones contenidas en la *Querella*, esgrimieron varias defensas afirmativas, entra las cuales aludimos a las siguientes: 1) que no fue discriminado por razón de su edad, ni por cualquier otro motivo; 2) que el apelante nunca fue empleado de LM; 4) que la cancelación del contrato se debió a la decisión de eliminar la posición de Vicepresidente de Operaciones y Gerente General del *Wyndham Palmas del Mar Beach and Golf Resort* ante los pobres resultados que obtuvo el apelante al manejar el hotel; 5) que no se le debía dinero alguno.[4]

Luego de que haberse presentado el *Informe Sobre el Manejo del Caso*, y atendidos varios incidentes procesales no pertinentes, los apelados presentaron *Solicitud de Sentencia Sumaria*. En el apartado destinado a identificar los hechos materiales que se proponían como incontrovertidos, enumeraron un total ochenta y cinco (85), aludiendo a la prueba documental que los sostenían, e incluyendo copia de sus anejos. En lo relativo a la aplicación del derecho a dichos hechos, argumentaron, en muy apretada síntesis, que: 1) tenían justa causa para cancelar el contrato de término fijo, debido a la reestructuración realizada tras las pérdidas generadas en el hotel; 2) el apelante no había logrado probar de manera *prima facie* que fuera objeto de discrimen por razón de edad.

En esa misma fecha, la parte apelante también presentó una *Moción Solicitando Sentencia Sumaria Parcial,* promoviendo treinta y seis hechos materiales como incontrovertidos, con alusión a la prueba documental que los sustentaban, junto a copia de anejos. En su argumentación de derecho afirmó que la cancelación del contrato por el apelado antes de su

---

[4] *Íd.*, págs. 12-26.

vencimiento constituyó un incumplimiento de sus términos; que inicialmente se presentó como causa para la cancelación del contrato una reorganización o reestructuración gerencial pero, al contestar la querella, es que por primera vez la parte apelada esgrimió como razón para la cancelación del contrato la eliminación de su plaza y que obtuviera pobres resultados, aunque no existiera ni una sola amonestación en su contra; que tal cancelación de la relación contractual ocurrió a pesar de que restaban nueve meses y quince días de su vigencia; que, no obstante haberse alegado por la parte apelada que la eliminación de la plaza fue debido a una reorganización, fue creada una *nueva plaza inexistente* para otra persona, previo a la cancelación de su contrato, con las mismas funciones que él realizaba.

En respuesta, los apelados presentaron *Oposición a Moción Solicitando Sentencia Sumaria Parcial*. En esta, incluyeron una tabla citando los hechos propuestos como incontrovertidos por la parte apelante, para entonces responderlos, con alusión a la prueba documental pertinente. Incluyeron, además, una lista de los hechos que proponían como incontrovertidos, también citando la prueba documental que los sostenían. Luego, argumentaron que el apelante no contaba con una acción de incumplimiento contractual, toda vez que, en síntesis, la cancelación del contrato se debió a una reestructuración del hotel, tras una pérdida de ingresos. A tenor, solicitaron que se declarase *No Ha Lugar* a la solicitud de sentencia sumaria parcial presentada por el apelante.

A su vez, la parte apelante presentó su *Oposición a Solicitud de Sentencia Sumaria*. Según le correspondía, enumeró los hechos que la parte apelante había propuesto como incontrovertidos, admitiéndolos o negándolos, junto a la citación de la documentación que, a su juicio, servía para impugnarlos, cuyas copias incluyó. Luego de afirmar que habían hechos en controversia, por lo que no procedía la desestimación del caso de

epígrafe, reiteró los argumentos de derecho ya esgrimidos en su moción dispositiva.

Es así como el TPI emitió la *Sentencia* aquí apelada, declarando *Ha Lugar* la *Solicitud de Sentencia Sumaria* presentada por los apelados, y *No Ha Lugar* la *Moción Solicitando Sentencia Sumaria Parcial* presentada por el señor Hugli Sutter. En consecuencia, desestimó la *Querella* incoada por este último en su totalidad y con perjuicio. Antes de disponer del asunto, concluyó que no existían hechos materiales en controversia que impidiesen la disposición sumaria del caso. Igualmente, determinó que el apelante no fue despedido de un empleo, sino que sus servicios fueron prescindidos mediante la terminación del contrato en cuestión. Estableció, además, que la terminación del contrato se debió a una reestructuración de las operaciones relacionada a pérdidas económicas. De igual forma, juzgó que el Sr. Hugli Sutter no logró establecer su caso de discrimen por razón de edad. En específico, dicho foro consignó las siguientes determinaciones de hechos en su dictamen:

1. LionGrove es una corporación de responsabilidad limitada y debidamente inscrita en el Departamento de Estado de Puerto Rico desde el 31 de mayo de 2018.

2. Dicha entidad se dedica mayormente a invertir en la industria hotelera.

3. El Sr. Nodarse es el Chief Executive Officer de LionGrove.

4. El Sr. Sariego funge como Managing Director y Chief Operating Officer de LionGrove.

5. LionGrove es la corporación matriz, inversionista y dueña de las coQuerelladas PHM y RMHM.

6. PHM es una corporación de responsabilidad limitada y debidamente inscrita en el Departamento de Estado de Puerto Rico desde el 24 de diciembre de 2019.

7. PHM es subsidiaria de LionGrove y administra el hotel Wyndham Palmas del Mar luego de que lo adquirió mediante compraventa de activos el 13 de enero de 2021.

8. RMHM es una corporación de responsabilidad limitada y debidamente inscrita en el Departamento de Estado de Puerto Rico desde el 9 de febrero de 2022.

9. RMHM administra el hotel Wyndham Río Mar luego de que la adquirió mediante compraventa el 24 de mayo de 2022.

**Executive Term Agreement**

10. El 23 de mayo de 2021, PHM y el Sr. Hugli suscribieron el Executive Term Agreement, mediante el cual el Sr. Hugli se comprometió a ejercer el rol de managing director en el hotel Wyndham Palmas del Mar.

11. Allí, el Sr. Hugli pactó que sus labores comenzarían el 29 de marzo de 2021.

12. Posteriormente, el puesto de managing director cambió a vicepresidente de operaciones de PHM, pero el Sr. Hugli mantuvo las mismas responsabilidades y funciones detalladas en el contrato.

13. El contrato tenía una vigencia de un (1) año y se podía renovar por un (1) año adicional si no se cancelaba por cualquiera de las partes.

14. Aunque el término original del contrato vencía el 23 de marzo de 2022, este quedó renovado automáticamente por un año adicional, es decir, hasta el 23 de marzo de 2023.

15. En el acuerdo suscrito, PHM se obligó a compensar al Sr. Hugli por la suma anual de $120,000.

16. Además de la compensación anual, PHM acordó con el Sr. Hugli que este sería elegible, —según su desempeño laboral—, a un bono de productividad hasta el 50% de su salario base, que, de cualificar, sería pagado en el segundo trimestre de cada año.

17. El bono de productividad y el posible aumento salarial mencionado en el contrato gozaron de carácter discrecional.

18. Como parte del contrato, el Sr. Hugli se comprometió a realizar cualquier otro deber, responsabilidad o iniciativa designada por PHM.

19. El Sr. Hugli fue empleado exclusivo de PHM desde el 23 de marzo de 2021 hasta el 15 de junio de 2022, fecha en que PHM canceló el Executive Term Agreement.

20. A la fecha de la cancelación del contrato en cuestión, el Sr. Hugli no tenía otro contrato de empleo vigente.

21. La Cláusula 12 sobre terminación del empleo dispuso que:

> a. The Company, with or without just cause, for any reason o for no reason, may terminate this Agreement at any time upon written notice by certified or registered mail, return receipt requested, to the other at the addresses indicated in Section 15 of this agreement.

b. In the event this Agreement is terminated by the Company without cause, the Company will pay Employee a fixed amount in a lump sum equal to the salary for three (3) months at current compensation or indemnity under P.R. Law 80 (1976), whichever is greater, and any other benefit accrued and not paid up to the date of termination.

c. [...]

22. Conforme al modo en que se debían realizar las notificaciones, incluyendo la terminación del contrato, la Cláusula 15 estableció que:

Any notice to be given to the Company shall be addressed to the address of its principal place of business, and any notice to be given to the Employee shall be addressed to him/her at his/her home address last shown on the records of the Company, or to such other address as a party hereafter designate in writing to the other. Any such notice shall have been duly given if hand delivered or enclosed in a properly sealed envelope, addressed as aforesaid, postage prepaid, registered or certified mail, return receipt requested, and deposited in a post office or branch post office regularly maintained by the United States Government.

23. Conforme a la justa causa para la cancelación del contrato se dispuso lo siguiente:

The Company may at any time terminate this Agreement and the Employee's employment hereunder for "Cause". For purposes hereof, the term "Cause" shall mean, in addition to Commonwealth of Puerto Rico's Law No. 80 of May 30, 1976, any of the following:
(a) conviction of the Employee for any crime constituting a felony in the jurisdiction in which committed, or for any other criminal act against the Company or its affiliates involving dishonesty or willful misconduct intended to injure the Company (whether or not a felony); (b) violation of any non-criminal law which would result in material harm to the Company; (c) failure or intentional or bad faith refusal of the Employee in any material respect to perform the duties of his employment or to follow the lawful and proper directives of the Board of Directors or any supervisor, provided such duties or directives are consistent with this Agreement; (d) any willful or intentional act of the Employee committed for the purpose, or having the reasonable foreseeable effect, of injury the Company or its affiliates or their business or reputation or of improperly or unlawfully converting for the Employee's own

personal benefit any property of the Company or its affiliates; (e) unsatisfactory work performance, including but not limited to, failing to meet the business, sales and performance goals established for the Employee; and (f) breach of any the provisions of Sections (6), (7), (8), (9) and/or (10). In the event of termination with just cause as herein defined, the Employee will only be entitled to receive the monthly compensation earned and not paid up to the date on which his/her employment is terminated less legally required withholdings.

24. El 15 de junio de 2022 el Sr. Sariego y la Sra. Mariemma Sánchez – la entonces vicepresidenta de Recursos Humanos de PHM– entregaron personalmente al Sr. Hugli un acuerdo de separación en el cual le informaron que PHM eliminó su puesto al restructurar sus operaciones.

25. LionGrove y RMHM no figuraron como partes en el "Executive Term Agreement".

26. La cláusula 1(c) del contrato estableció las funciones y responsabilidades que debía ejercer el Sr. Hugli, a saber:

i. Lead, manage and reposition the Hotel to achieve and/or exceed RevPAR index to Comp Set as reflected in Proforma.

ii. Implement strategic initiatives to achieve and exceed Total Revenues and NOI as reflected in Proforma (2021 has not been updated with actuals) [...]

iii. Create a service culture that positions the Hotel to achieve a strong positive growth on guest reputation against comp set with an overall guest satisfaction score of 4.5 out of 5.

iv. Incorporate best practices and strategies that support a commitment to high level of awareness and prioritization of ESG (Environmental, Social and Governance) targets.

v. Any other duties, responsibilities, initiatives and goals as directed by the Company.

27. Relacionado a lo anterior, desde el 23 de marzo de 2021 hasta el 15 de junio de 2022, PHM no obtuvo ni excedió la totalidad de los revenues ni del Net Operating Income, según dispuesto en el párrafo 1(c) del contrato.

28. El Sr. Hugli se comprometió en el Contrato Ejecutivo Temporero a que el hotel Wyndham Palmas del Mar obtuviera una ganancia o total revenue de $5.0 millones para el año 2021.

29. Sin embargo, a finales del 2021, el hotel Wyndham Palmas del Mar no obtuvo esa ganancia o total revenue. En vez, PHM generó pérdidas ascendentes a $384,258.26.33.

30. El hotel Wyndham Palmas del Mar tampoco generó ganancias desde enero a junio de 2022. Por el contrario, durante ese periodo el hotel Wyndham Palmas del Mar no obtuvo "revenue", sino una suma conocida como amount, o AMT, de un Net Operating Loss ascendente a $386,319.00.

31. Como resultado de la situación financiera de PHM, la Sra. Vázquez, vicepresidenta de finanzas al momento de los hechos– realizó al final del año 2021 un cash call a los inversionistas de PHM debido a que proyectó que la compañía necesitaría más dinero para pagar la nómina de los empleados.

32. Consecuentemente, a principios del 2022 PHM realizó una reestructuración en el hotel Wyndham Palmas del Mar para así mantener las operaciones y la empleomanía.

**Adquisición del hotel Wyndham Río Mar por PHM**

33. En marzo de 2022, LionGrove – como inversionista – comenzó a realizar gestiones para que Río Mar Hospitality Holdings, LLC. comprara los activos del hotel Wyndham Río Mar.

34. El Sr. Hugli y varios empleados de LionGrove y de PHM formaron parte del comité de transición para dar apoyo durante la adquisición del hotel. Así, el 8 de marzo de 2022, el Sr. Hugli recibió un correo electrónico para que se uniera al Microsoft Team creado para las comunicaciones relacionadas al comité.

35. La función del Sr. Hugli en el comité consistió mayormente en determinar cómo el equipo de Río Mar podía apoyar directamente a las operaciones del hotel Wyndham Palmas del Mar.

36. Entre los empleados de PHM en el comité, estaba la vicepresidenta de finanzas, la Sra. Vázquez y la entonces directora de Recursos Humanos, la Vanessa Acosta (en adelante, "Sra. Acosta") quien atendió la transición de nómina de los empleados de Wyndham Río Mar.

**Trámites para la obtención de licencia del casino**

37. El Sr. Hugli formó parte del equipo de trabajo para que el hotel Wyndham Río Mar obtuviera la licencia del casino.

38. LionGrove, el Sr. Nodarse y el Sr. Hugli colaboraron entre ellos para que RMHM obtuviera la licencia del casino expedida por la Oficina del Comisionado de Instituciones Financieras, (OCIF) para el hotel Wyndham Río Mar.

39. Como parte de los trámites para que RMHM pudiera obtener la licencia del casino y a raíz de las disposiciones establecidas en la Ley Núm. 11 de 22 de agosto de 1933, según

enmendada, conocida como la Ley de Máquinas de Juegos al Azar, 15 LPRA sec. 82, la OCIF solicitó al Sr. Nodarse y el Sr. Hugli sus respectivas cualificaciones y datos personales.

40. Así, el 24 de mayo de 2022, la OCIF expidió una licencia del casino a nombre de Río Mar Hospitality Management, LLC.

41. Las labores que realizó el Sr. Hugli en el comité o equipo de transición para la adquisición del hotel Wyndham Río Mar fueron efectuadas en virtud del contrato y la compensación que recibió fue por parte de PHM, según lo allí acordado.

42. PHM no pagó el bono de productividad a ningún empleado, durante el periodo entre 2021 y 2022, debido a su situación financiera.

43. El 24 de abril de 2022, el Sr. Zarzosa comenzó a trabajar en el puesto de senior vice president and general manager de Wyndham Río Mar y a supervisar las operaciones de Wyndham Palmas del Mar.

44. El Sr. Zarzosa fue y continúa siendo empleado de RMHM y, por ende, su salario lo sufragó RMHM.

45. El Sr. Zarzosa, —supervisor del Sr. Hugli—, manejaba las operaciones y administración de ambos hoteles.

46. PHM explicó que eliminó el puesto de vicepresidente de operaciones porque el nivel de operación no justificaba mantenerlo, porque el hotel Wyndham Palmas del Mar no estaba generando ganancias suficientes, y porque el Sr. Hugli no estaba cumpliendo con las metas y objetivos de la compañía y requeridos por el contrato.

47. Cuando se canceló el contrato de empleo en cuestión, también se eliminó la posición de vicepresidente de operaciones y no se reclutó a nadie con ese mismo puesto y funciones.

48. Como parte de la restructuración, PHM creó el puesto de menor jerarquía llamado resort manager con una compensación anual de $91,225.68.

49. Las funciones de la posición de Resort Manager incluyeron garantizar el servicio y calidad del departamento de Housekeeping, el departamento de seguridad y el departamento de Guest Services en el hotel Wyndham Palmas del Mar. Dicho rol, distinto al ocupado por el Sr. Hugli, no incluye la supervisión de todos los departamentos del hotel ni maneja el presupuesto y operación del hotel Wyndham Palmas del Mar. La posición de Resort Manager tampoco realiza funciones sobre la facturación que realiza dicho hotel para mantener sus operaciones.

50. Posteriormente, el 23 de junio de 2022, PHM contrató a la Sra. Maricely Del Río, (Sra. Del Río) para que comenzara a trabajar el 5 de julio de 2022 en función de resort manager para Wyndham Palmas del Mar. Antes de ocupar el puesto, la

Sra. Del Río ocupaba el puesto de director guest services en el hotel Wyndham Río Mar.

51. Como resort manager, la Sra. Del Río se reporta al Sr. Zarzosa, senior vice president y general manager de los hoteles Wyndham Palmas del Mar y Wyndham Rio Mar.

52. El salario anual que genera el puesto de resort manager es de $91,225.68.

53. La Sra. Del Río nació el 1 de noviembre de 1963 y actualmente tiene 61 años.

54. El Sr. Hugli nació el 1 de mayo de 1958 y actualmente tiene 66 años.

55. El Sr. Zarzosa nació el 21 de mayo de 1958 y actualmente tiene 66 años.[5]

Inconforme, la parte apelante acude ante nosotros mediante recurso de *apelación*, señalando la comisión de los siguientes errores:

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL RESOLVER SUMARIAMENTE DESESTIMANDO LA TOTALIDAD DE LA CAUSA DE ACCIÓN DEL APELANTE, A PESAR DE HABER CONTROVERSIAS DE HECHOS MATERIALES.

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EXCLUIR VARIOS HECHOS PRESENTADOS POR LA PARTE APELANTE EN SU OPOSICION A SENTENCIA SUMARIA, AVALADOS POR DOCUMENTOS Y DECLARACIONES QUE ESTABLECIAN QUE HABIAN CONTROVERSIAS DE HECHOS POR LO QUE ERA IMPROCEDENTE RESOLVER SUMARIAMENTE.

Ante ello, los apelados presentaron su *Alegato en Oposición*. Con el beneficio de la comparecencia de ambas partes, estamos en posición de resolver.

## II. Exposición de Derecho

### A. La Sentencia Sumaria

El propósito de las Reglas de Procedimiento Civil es proveer a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1; *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018); *Rodríguez Méndez et al. v. Laser Eye,* 195 DPR 769, 785 (2016), *Oriental Bank v. Perapi et al.*, 192 DPR 7, 25 (2014). La

---

[5] *Íd.*, págs. 877-884.

sentencia sumaria hace viable este objetivo al ser un mecanismo procesal que le permite al tribunal dictar sentencia sobre la totalidad de una reclamación, o cualquier controversia comprendida en ésta, sin la necesidad de celebrar una vista evidenciaria. J. A. Echevarría Vargas, *Procedimiento Civil Puertorriqueño*, 1era ed., Colombia, 2012, pág. 218.

Procede dictar sentencia sumaria si "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia si las hubiere, acreditan la inexistencia de una controversia real y sustancial respecto a algún hecho esencial y pertinente y, además, si el derecho aplicable así lo justifica". *González Santiago v. Baxter Healthcare, supra; Roldán Flores v. M. Cuebas et al., supra; Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 225 (2015), *SLG Zapata-Rivera v. J. F. Montalvo*, 189 DPR 414, 430 (2013). A su vez se recomienda, en aquellos casos en que el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012).

La mera existencia de "una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria… cuando causa en el tribunal una duda real y sustancial sobre algún hecho relevante y pertinente". *Pepsi-Cola v. Mun. Cidra et al.,* 186 DPR 713, 756 (2012). Se considera un hecho esencial y pertinente, aquél que puede afectar el resultado de la reclamación acorde al derecho sustantivo aplicable. *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

Por otra parte, la duda para impedir que se dicte sentencia sumaria no puede ser cualquiera, sino que debe ser de tal grado que "permita concluir que hay una controversia real y sustancial sobre hechos relevantes y pertinentes". *Ramos Pérez v. Univisión, supra*, págs. 213-214.

Dicho lo anterior, es esencial reconocer que la Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V, R.36, establece de manera específica los requisitos de forma con los que debe cumplir la parte que promueve la

moción de sentencia sumaria, así como la parte que se opone a ella. En lo pertinente, la parte promovente debe exponer un listado de hechos no controvertidos, desglosándolos en párrafos debidamente numerados y, para cada uno de ellos, especificar la página o el párrafo de la declaración jurada u otra prueba admisible que lo apoya. A su vez, la parte que se opone a la moción de sentencia sumaria está obligada a citar específicamente los párrafos según enumerados por el promovente que entiende están en controversia y, para cada uno de los que pretende controvertir, detallar la evidencia admisible que sostiene su impugnación con cita a la página o sección pertinente. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 137 (2015). La parte que se opone no puede descansar exclusivamente en sus alegaciones ni tomar una actitud pasiva. *Toro Avilés v. P.R. Telephone Co.*, 177 DPR 369, 383 (2009). Por el contrario, tiene que controvertir la prueba presentada por la parte solicitante, a fin de demostrar que sí existe controversia real sustancial sobre los hechos materiales del caso en cuestión. *González Aristud v. Hosp. Pavía*, 168 DPR 127, 138 (2006).

Nuestro más alto foro ha manifestado que "**a menos que las alegaciones contenidas en la moción de sentencia sumaria queden debidamente controvertidas**, éstas podrían ser admitidas y, de proceder en derecho su reclamo, podría dictarse sentencia sumaria a favor de quien promueve". (Énfasis provisto). *Meléndez González et al. v. M. Cuebas, supra,* pág. 137.

B. **Función revisora del foro apelativo con respecto a la sentencia sumaria dictada por el foro primario**

En el caso de revisar sentencias del Tribunal de Primera Instancia dictadas mediante el mecanismo de sentencias sumarias o resolución que deniega su aplicación, nuestro Tribunal de Apelaciones se encuentra en la misma posición que el tribunal inferior para evaluar su procedencia. *Meléndez González et al. v. M. Cuebas, supra.* Los criterios a seguir por este foro intermedio al atender la revisión de una sentencia sumaria dictada por

el foro primario han sido enumerados con exactitud por nuestro Tribunal Supremo. *Íd.* A tenor, el Tribunal de Apelaciones debe:

1) examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.

Además, al revisar la determinación del TPI respecto a una sentencia sumaria, estamos limitados de dos maneras; (1) solo podemos considerar los documentos que se presentaron ante el foro de primera instancia, (2) solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González, et al. v. M. Cuebas, supra.* El primer punto se enfoca en que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Mientras que el segundo limita la facultad del foro apelativo a revisar si en el caso ante su consideración existen controversias reales en cuanto a los hechos materiales, pero no puede adjudicarlos. *Íd.* en la pág. 115. También, se ha aclarado que al foro apelativo le es vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. *Vera v. Dr. Bravo,* 161 DPR 308, 335 (2004).

C. **Ley Núm. 100-1959**

La Ley Núm. 100 de 30 de junio de 1959, según enmendada (29 LPRA sec. 146 *et seq.*), mejor conocida como la *Ley Antidiscrimen de Puerto Rico* (Ley 100), fue creada para "ofrecer una eficaz protección a los

trabajadores contra diversos tipos de discrimen en el ámbito laboral". *Mestres Dosal v. Dosal Escandón*, 173 DPR 62, 68 (2008). Para alcanzar dicho objetivo, esta ley prohíbe a un patrono despedir o discriminar a sus empleados **por razón de edad**, raza, color, sexo, origen social o nacional, condición social, afiliación política o ideas políticas o religiosas o por ser víctima de violencia doméstica, agresión sexual o acecho. Íd, págs. 68-69. (Énfasis suplido).

Bajo las disposiciones de la Ley 100, en ausencia de justa causa para el despido, se presume que éste fue discriminatorio. Art. 3 de la Ley 100, 29 LPRA sec. 148; *Ramos Pérez v. Univisión*, 178 DPR 200, 222 (2010). Sin embargo, **para que la presunción quede debidamente establecida, el empleado reclamante debe establecer un caso *prima facie* de discrimen**. (Énfasis provisto). *López Fantauzzi v. 100% Natural*, 181 DPR 92 (2011). Es decir, que en una reclamación al amparo de la Ley 100, *supra*, **el peso de la prueba para establecer las bases de su reclamación corresponde inicialmente al empleado**. *Íd.*, pág. 122.

Para que se active la presunción de que el despido fue discriminatorio, el empleado deberá demostrar "primero, que hubo un despido o acto perjudicial; segundo, que éste se realizó sin justa causa; y tercero **algún hecho base que lo ubique dentro de la modalidad de discrimen bajo la cual reclama".** (Énfasis provisto). *Íd.*, pág. 123; *Ramos Pérez v. Univisión, supra,* pág. 222 (2010); *S.L.G. Hernández-Beltrán v. TOLIC*, 151 DPR 754, 775-776 (2000). Una vez probado lo anterior es que el peso de la prueba recae sobre el patrono. *López Fantauzzi v. 100% Natural, supra.*

Si el empleado lograse establecer *prima facie* un caso de discrimen, el patrono podrá atacar la presunción activada de las siguientes maneras: (1) derrotar el hecho básico, esto es, la ausencia de justa causa; (2) destruir el hecho presumido de que el despido fue por causa de motivos

discriminatorios; o (3) destruir el hecho básico y el presumido, a la vez. *Íd.,* pág. 390; *López Fantauzzi v. 100% Natural, supra,* pág. 124. En otras palabras, para que el patrono pueda rebatir la presunción de discrimen, tiene que probar que la existencia del discrimen es menos probable que su inexistencia. *Odriozola v. S. Cosmetic Dist. Corp.*, 116 DPR 485, 502 (1985).

Si el patrono logra rebatir la presunción de discrimen, el empleado nuevamente tendrá oportunidad de demostrar la existencia del discrimen, aunque sin el beneficio de la presunción inicial. *S.L.G. Hernández-Beltrán v. TOLIC*, supra, pág. 775. Es decir, que **el empleado tendrá que probar hechos específicos de los cuales surja el discrimen.** (Énfasis provisto). *Íd.*

Sólo si queda probado que el patrono incurrió en conducta discriminatoria contra el empleado, estará obligado a indemnizarlo por los daños que el acto le hubiera ocasionado. *Mestres Dosal v. Dosal Escandón, supra,* pág. 69; 29 LPRA sec. 146. Ello, pues el objetivo de la Ley 100, *supra,* es facilitarle al empleado probar su caso, y no relevarlo de la necesidad que tiene de presentar prueba a su favor. *S.L.G. Hernández-Beltrán v. TOLIC, supra*, pág. 774.

### III. Aplicación del Derecho a los hechos

Por encontrarse este foro intermedio en idéntica posición que el tribunal *a quo* al revisar una solicitud de sentencia sumaria, (en tanto la revisión que acontece es *de novo*), primero hemos examinado si las mociones dispositivas instadas por las partes, junto a sus respectivos escritos en oposición, cumplieron con los requisitos formales que impone la Regla 36.3(a)y(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(a)y(b). Concluimos en la afirmativa.

Entonces, auscultada la documentación incluida por las partes para sostener las determinaciones de hechos materiales que cada una de estas promovió como incontrovertidas, junto a la utilizada para impugnarlas, coincidimos con el TPI al determinar que no existen controversias de

hechos materiales que justifiquen posponer la aplicación del derecho pertinente y disponer del pleito. Claro, nuestra manifestación tiene el efecto inmediato de disponer del recurso de apelación, en tanto este se fundamentó por entero en la afirmación de que persistían hechos materiales en controversia que imposibilitaban la disposición de la causa de acción por la vía sumaria. No coincidimos con la apreciación de la parte apelante.

Como primer asunto, al verificar la prueba documental presentada por las partes en sus respectivas mociones dispositivas, juzgamos que, en lo referente a la causa de acción bajo la Ley 100, la parte promovente no logró precisar algún hecho base que lo ubicara dentro de la modalidad de discrimen bajo la cual reclamó, el discrimen por edad. Más aún, resulta reflejo de lo que afirmamos, que, al discutir los señalamientos de errores incluidos en su recurso de apelación, no dedicara esfuerzo significativo alguno por tratar de colocar a este foro apelativo en la posición de subvertir la desestimación de la causa de acción por alegado discrimen de edad, sino que concentró sus esfuerzos discursivos más bien en la discusión sobre la relación contractual imperante entre las partes.

Entonces, en lo que refiere a relación contractual aludida, al examinar la documentación con la que contó el TPI, más las argumentaciones que añadió la parte apelante en su recurso, tampoco logramos apreciar que se hubiesen impugnado los hechos medulares atinentes a la causa para la cancelación de las obligaciones entre las partes, según esgrimidas por la parte apelada. Es decir, por una parte, no albergamos dudas de que en el contrato aludido se hizo provisión expresa para su cancelación antes del cumplimiento del término acordado; y, por la otra, no encontramos documentación que sirva para impugnar el hecho medular de que la cancelación fue producto de la reestructuración de las operaciones en el hotel, tras este sufrir pérdidas económicas, lo que guarda

estrecha relación con la imputación de que el apelante no cumplió con las metas que a esos efecto se había trazado-obligado. La argumentación que incluyó la parte apelante en su recurso para tratar de refutar tales hechos, en modo alguno minimizó el valor probatorio de la prueba documental aportada por la parte apelante en su moción dispositiva para establecerlos[6]. Igual suerte corre la argumentación relativa a la presunta relación patrono-empleado entre el apelante con Liongrove y RMHM.

En definitiva, juzgamos correcta la enumeración de hechos medulares incontrovertidos alcanzada por el TPI, y su ulterior aplicación del derecho correspondiente, por dicho foro estaba en perfecta posición, como lo hizo, para disponer del pleito de manera sumaria.

**IV. Parte dispositiva**

Por los fundamentos que anteceden corresponde *Confirmar* la *Sentencia* apelada.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[6] Ver página diez del recurso de apelación.